## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**CARMEN CIOTOLA,**                          :

             **Plaintiff**               :      **CIVIL ACTION NO. 3:19-753**

      **v.**                             :            **(JUDGE MANNION)**

**STAR TRANSPORTATION &**                :
**TRUCKING, LLC,**
**And,**                                 :

**QUARTERBACK**                          :
**TRANSPORTATION, USA INC.,**
**And,**                                 :

**BALL METAL BEVERAGE**                  :
**CONTAINER CORP.**
             **Defendants,**             :

**And,**                                 :

**OLDCASTLE, INC.**                      :
**LIBERITY MUTUAL**
**CORPORATION,**                         :
             **DEFENDANT/**
             **INTERVENORS**             :

## <u>MEMORANDUM</u>

Pending before the court is defendant Quarterback Transportation USA, Inc.'s ("Quarterback") motion for summary judgment against all other parties, pursuant to Fed.R.Civ.P. 56, (Doc. 69), arguing that the plaintiff's state law clams against it in his second amended complaint ("SAC"), (Doc.

25), should be dismissed since they are preempted under the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. §14501(c)(1). Quarterback contends that plaintiff's SAC for damages against it for personal injuries and negligence claims are preempted under FAAAA, since they relate to its core services of brokering the shipment of goods in interstate commerce. Also pending is the plaintiff's motion for partial summary judgment against Quarterback, (Doc. 75), arguing that Hataway was the common law agent, servant or employee of Quarterback at the time of the accident rendering Quarterback vicariously liable for Hataway's conduct as a matter of law. Alternatively, plaintiff argues that pursuant to the Federal Motor Carrier Safety Regulations ("FMCSR") Quarterback was the *de facto* Motor Carrier and statutory employer since it allegedly exercised substantial authority and control over almost every aspect of the freight being transported at the time of the accident. (Doc. 75).[1]

For the reasons that follow, the court will **DENY** the cross-motions for summary judgment of Quarterback, (Doc. 69), and plaintiff, (Doc. 75). Quarterback's motion is denied because the FAAAA does not preempt state

---

[1] In his motion for partial summary judgment with respect to his claims against Quarterback, (Doc. 75), plaintiff requested oral argument. Plaintiff's request is denied since the record is sufficient for the court to rule on the pending cross-summary judgment motions.

law claims against a broker or a carrier. Plaintiff's motion is denied because genuine issues of material fact exist as to whether Quarterback acted as a broker and whether Hataway was an employee of Quarterback.

## I.    BACKGROUND[2]

On May 2, 2019, plaintiff, Carmen Ciotola, initiated this action by filing a complaint against Ball Metal Beverage Container Corp. ("Ball Metal"), Quarterback, and Star Transportation & Trucking LLC ("Star") for personal injuries he sustained from a motor vehicle accident that occurred on November 12, 2018. (Doc. 1). Plaintiff is now proceeding on his SAC which he filed, with Exhibits, against Ball Metal and Quarterback on September 27, 2019. (Doc. 25).

Specifically, on November 12, 2018, Ronald Hataway was driving a 2009 Volvo commercial tractor trailer on Interstate 81 in Luzerne County, PA, within the scope of his contractor relationship with Star. Hataway was

---

[2]Also pending are the motions for summary judgment of Quarterback with respect to its claims asserted against Star in its third party complaint, (Doc. 67), of Ball Metal with respect to plaintiff's claims against it in his SAC, (Doc. 71), and of Star with respect to the claims asserted against it in Quarterback's third party complaint, (Doc. 73).
The court will decide these other motions in separate opinions.

provided the tractor trailer he drove by Star, which Star had leased. Star was contracted as a motor carrier by Quarterback to ship Ball Metal's products. While Hataway was driving in the southbound lane, he collided into the rear end of a 2004 Ford Ranger pick-up driven by plaintiff causing him injuries. When the accident occurred, Hataway was transporting a load of aluminum cans used for beverages from the shipper, Ball Metal. The load Hataway was transporting was brokered by Quarterback pursuant to Agreements it had with Ball Metal and Star, including its Broker-Carrier Agreement with Star. In addition to suing Star and Ball Metal for the injuries he sustained in the accident, plaintiff sued Quarterback, which had arranged for the transportation of the load of aluminum cans from Ball Metal's plant in Wallkill, New York, to Missouri.

On September 24, 2018, Hataway plead guilty to "Possession of Alcohol Beverage in CMV" regarding the accident with plaintiff. Hataway is not a named defendant in this case.

Additionally, plaintiff originally named Star as a defendant in this case, however, plaintiff settled his claims against Star and dismissed all of the claims against it on September 25, 2019, pursuant to a Joint Tortfeasor Release Agreement. As such, plaintiff did not name Star as a defendant in his SAC.

- 4 -

In his SAC, plaintiff raises claims against Quarterback in Counts I-IV and X, namely, Vicarious Liability for Hataway, Negligent Hiring/Supervision/Retention, Reckless Hiring/Supervision/Retention regarding Star, Negligent Entrustment regarding Hataway and Star, and Joint Venture with Ball Metal. Plaintiff basically alleges that at the time of the accident Hataway was an employee of Quarterback and, that Quarterback was acting as the broker and a "motor carrier" for the Ball Metal shipment Hataway was transporting and, thus is responsible for Hataway's negligence in causing the accident.

On October 7, 2019, Quarterback filed a motion to dismiss plaintiff's SAC, or alternatively, motion for summary judgment, (Doc. 26), along with its brief in support and attached Exhibits, (Doc. 27). Quarterback contended that all of plaintiff's claims against it were preempted by the FAAAA because all of the claims against it relate to its core services of brokering the shipment of goods and hiring motor carriers to transport shipments in interstate commerce. It stated that it is only a licensed property broker by the Federal Motor Carrier Safety Administration ("FMCSA") and that it only arranged with the shipper Ball Metal for the transportation of Ball Metal's cargo by Star. It also stated that Star's driver, Hataway, was hauling Bell Metal's cargo on the day of the accident.

- 5 -

Also, on October 7, 2019, Quarterback filed a Third Party Complaint against Star based on its liability for the November 12, 2018 accident. (Doc. 28).

On October 22, 2019, plaintiff filed his brief in opposition to Quarterback's motion, (Doc. 26), with attached Exhibits, (Doc. 41).

Following discovery, Quarterback filed a motion for summary judgment on April 6, 2020, against all other parties in this case, but mainly seeking judgment with respect to plaintiff's claims against it in his SAC. (Doc. 69). Also on April 6, 2020, plaintiff filed a motion for partial summary judgment with respect to his claims in his SAC against Quarterback. (Doc. 75).[3] Both motions have been briefed and exhibits have been filed.[4] Ball Metal did not file a brief in opposition to either of the cross-summary judgment motions and, thus is deemed as not opposing them.

---

[3]Since the court is considering Quarterback's summary judgment motion, (Doc. 69), and plaintiff's summary judgment motion, (Doc. 75), as well as the evidence they submitted, Quarterback's pending motion to dismiss, (Doc. 26), will be denied as moot.

[4]Although Quarterback failed to file a separate statement of material facts with its summary judgment motion as required by Local Rule 56.1, M.D.Pa., it does have a statement of facts with citations to the record in its summary judgment motion, (Doc. 69). Plaintiff properly filed his separate statement of material facts, (Doc. 76), with his motion, (Doc. 75).

In his motion for partial summary judgment against Quarterback, plaintiff contends that under the FMCSR and prevailing case law, Quarterback functioned as a motor carrier and statutory employer when it exercised substantial authority and control over almost every aspect of the Ball Metal shipment. Additionally, plaintiff asserts that Hataway acted as Quarterback's common law agent, servant, or employee at the time of the accident, which therefore makes Quarterback vicariously liable for Hataway's conduct.

On April 27, 2020, Quarterback filed its brief in opposition to plaintiff's motion, (Doc. 75), with Exhibits attached, (Doc. 80).

Based on the following, the court finds that plaintiff's claims against Quarterback are not preempted by the FAAAA since the FAAAA does not preempt general tort law that does not significantly impact Quarterback's prices, routes, and services. The court also finds that genuine issues of material facts exist regarding whether Quarterback acted as a broker or carrier and whether Hataway was an employee of Quarterback.[5]

---

[5]The court notes that disputed issues of material fact exist as to whether Hataway was an employee or agent of Quarterback or whether he was employed by Star despite the language in Quarterback's Chubb Policy upon which plaintiff was attempting to rely in his proposed reply brief in support of his summary judgment motion. (*See* Doc. 94).

## II.    MATERIAL FACTS

On November 12, 2018, Ball Metal arranged for the transportation of a load of freight from Middletown, New York, to Farmington, Missouri. Ball Metal brokered, hired, assigned, or contracted the transportation of the freight to Quarterback.

Quarterback is a foreign corporation with a physical address of 1210 Sheppard Avenue East, Suite 114, Toronto, Ontario, M2K 1E3, and is a citizen of Canada. Quarterback is licensed and insured as a broker according to the FMCSA. Quarterback also possesses a U.S. Department of Transportation number, 2237651, and Motor Carrier number, 580470. Quarterback advertises on its website stating items such as: "Quarterback Transportation offers a wide variety of driving options for qualified carriers"; "Quarterback Transportation is also a great partner for Owner Operators. Bring your truck, or join our existing group of drivers and carriers who continue to enjoy their working experience with Quarterback Transportation"; "Quarterback Transportation provides Transportation, Logistics and Supply Chain Solutions that consistently exceed the expectations of our valued customers"; and "At Quarterback Transportation, our team of industry professionals provide decades of experience managing

all aspects of reliable freight movements within the United States, Canada, and Mexico." *See* https://qbtransportation.com/carriers/; https://qbtransportation.com/about-us/our-company/. Quarterback's website also contains advertisements for various types of trucking equipment available for customers. Some advertisements also have a Quarterback logo placed on available trucking equipment.

Ball Metal and Quarterback entered into a contract titled "Shipper/Broker Transportation Agreement." (BMBC0000001-BMBC0000031). The Shipper/Broker Transportation Agreement set the terms of Quarterback providing carriers to Ball Metal to ship their freight. Part of this Agreement included Ball Metal paying Quarterback for any fuel costs that arose from each shipment.

In the year leading up to the accident at issue, Quarterback was paid approximately $1,000,000 for fuel by Ball Metal. Appendix E to the Shipper/Broker Transportation Agreement lists Quarterback as the Carrier and contains a Quarterback representative's signature, Nick Deroschers, in the Carrier section. Section 1 to Appendix E titled "Term" to the Agreement states:

> The initial term of this agreement shall commence on the Effective Date and, unless terminated prior to the end of the Initial Term, shall continue for a period of [ 1 ] year(s)) thereafter. By providing notice to the

CARRIER no less than (30) days prior to expiration of the Initial Term of this Agreement, SHIPPER may, at its sole and unilateral discretion, renew the Agreement…

(BMBC000014).

Section 2 to Appendix E states that:

CARRIER, as an independent contractor, desires to furnish motor carrier surface transportations services as more fully described herein ("Transportation Services") to SHIPPER for the transportation of SHIPPER's commodities and represents and warrants that it is a duly registered motor carrier in interstate and intrastate commerce with the U.D. Department of Transportation Federal Motor Carrier Safety Administration ("DOT") and/or applicable state regulatory agencies and is fully authorized and capable of performing all transportation services;

(BMBC0000014).

Section 3 to Appendix E states:

CARRIER shall, at its sole cost and expense, provide an efficient business operation and all qualified personnel, appropriately maintained equipment, supplies, fuel, and parts necessary to perform the Transportation Services. Carrier shall perform SHIPPER'S distinct transportation needs and/or special requirements as required from time to time and as more fully described in the attached Schedules.

(BMBC0000014).

Appendix E to the Broker/Shipper Transportation Agreement was signed and effective on December 2, 2014. There is no indication Appendix E was renewed by the shipper, Ball Metal, according to the terms established in section one, "Terms." (BMBC000014).

- 10 -

Quarterback brokered, hired, assigned, or contracted the physical transportation of the freight to Star. Star is a small trucking company with approximately twenty to twenty-five independent contractors. Star has only one employee, Almir Muharemovic, who is the owner and corporate designee. In his deposition, Mr. Muharemovic verified that it was Star's responsibility alone to provide a driver for the Ball Metal load and to review Mr. Hataway's credentials. He also verified that Star did not send Mr. Hataway's credentials to Quarterback for approval.

Quarterback had no control over who Star hired to transport Ball Metal's cans. Quarterback "doesn't hire or employ any drivers." (Doc. 60, Exhibit C, Deposition of Anthony Pomocik, at 46). Additionally, Mr. Muharemovic stated that Star provided the 2009 Volvo commercial truck that Mr. Hataway drove at the time of the accident.  Quarterback specified the type of equipment that should be used for the shipment and the time the load should be delivered.

Star contracted with Hataway to operate a 2009 Volvo commercial tractor trailer in order to deliver the Ball Metal load for Quarterback. Star provided Hataway with the tractor trailer. Neither Star nor Quarterback determined Hataway's route. Hataway determined his route by using a personal global positioning system ("GPS").

On the day of transport, Quarterback's Carrier Load Confirmation instructed Hataway to do the following: identify himself as a representative of Quarterback when he arrived at Ball Metal to pick up the load; sign the Bill of Lading on behalf of Quarterback; directly communicate with Quarterback on his progress; report any problems to Quarterback directly; any accessory charges related to the transportation of the load would require prior authorization by Quarterback; and to provide a signed proof of delivery to Quarterback. The Bill of Lading listed Quarterback as the Carrier for the November 12, 2018 shipment. Ball Metal's Carrier Load Report lists Quarterback as the Carrier and contains several communications from Ball Metal to Quarterback. Ball Metal relied on Quarterback for all communication related to the delivery, such as delivery time, status, and location of the shipment.

Quarterback monitored the driver's hours, location, and routes. Ball Metal used software provided by BluJay Solutions to monitor its shipment. The Tender Acceptance confirmation email sent to Ball Metal on November 12, 2018 lists Quarterback as the Carrier. Ball Metal had no contact with Star in relation to the November 12, 2018 shipment.

After Haraway picked up the load at Ball Metal, he began transporting the cans to their destination on November 12, 2018, and during his trip while

driving southbound on Interstate 81 in Luzerne County, PA, he collided into the rear end of plaintiff's pick-up truck, causing plaintiff injuries. The police report indicated that Hataway took his eyes off the road and crashed into plaintiff's pick-up truck at a high rate of speed, which then caused plaintiff's pick-up to crash into the vehicle in front of him. (*See* Police Report, Doc. 76, Exhibit A at ¶33). The police cited Hataway with three violations regarding the collision. On September 24, 2018, Hataway plead guilty to "Possession of Alcohol Beverage in CMV."

## III.  DISCUSSION[6]

Before the court is Quarterback's motion for summary judgment, (Doc. 69), regarding plaintiff's claims against it in his SAC, and plaintiff's partial motion for summary judgment against Quarterback, (Doc. 75). This Court has jurisdiction pursuant to 28 U.S.C. §1332. Venue is proper under 28 U.S.C. §1391. Plaintiff, Carmen Ciotola, is an adult individual who is domiciled at 2 Honey Hole Road, Drums, Pennsylvania, and is a citizen of

---

[6]Since Quarterback and plaintiff state in their respective briefs the proper legal standard for a motion for summary judgment under Rule 56, the court will not repeat it herein. Suffice to say that in deciding a motion for summary judgment, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *See* <u>Andreoli v. Gates</u>, 482 F.3d 641, 647 (3d Cir. 2007).

the Commonwealth of Pennsylvania. Defendant Ball Metal is a Colorado corporation with a principal place of business of 9300 West 108th Circle, Westminster, CO, and is a citizen of the state of Colorado. Quarterback is a foreign corporation with a physical address of 1210 Sheppard Avenue East, Suite 114, Toronto, Ontario, and is a citizen of Canada. Plaintiff seeks an award of over $75,000. Therefore, complete diversity exists between the plaintiff and each defendant because plaintiff does not share a state of citizenship with any defendant and the amount in question is over $75,000.

Quarterback argues that plaintiff's state law tort claims against it are preempted by the FAAAA. Quarterback asserts that it only provided brokerage services for Ball Metal and that the Agreements show it was only serving as a broker to arrange a motor carrier, i.e., Star, to be retained to transport Ball Metal's cans from Middletown, New York, to Farmington, Missouri. Plaintiff argues that Quarterback acted as a carrier, and not a broker, regarding Ball Metal's shipment and that Hataway, in effect, was working for Quarterback at the time of the accident.

Thus, at issue is whether plaintiff's state law claims against Quarterback should be dismissed since they are preempted by the FAAAA, 49 U.S.C. §14501(c)(1). "Preemption is an affirmative defense that the defendant has the burden to prove." Lupian v. Joseph Cory Holdings LLC,

905 F.3d 127, 130 (3d Cir. 2018). As such, Quarterback has the burden to demonstrate that plaintiff's state-law tort claims are preempted. Also, "a claim of 'express preemption, [such as that plaintiff's negligent brokering claim is preempted by the FAAAA, §14501(c)(1)] occurs when the language of the federal statute reveals an express congressional intent to preempt state law." Loyd v. Salazar, 416 F.Supp.3d 1290, 1293 (W.D.Ok. 2019) (citations omitted). "Congress enacted the FAAAA to protect freight shipments from state regulations." *Id.* at 1295.

The FAAAA's preemption provision, 49 U.S.C. §14501(c), provides in relevant part:

> a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.[7]

The court in Montoya v. CRST Expedited, Inc., 404 F.Supp.3d 364, 401 (D.Mass. Sept. 6, 2019), explained:

---

[7] *See* 49 U.S.C. §13102(2) ("broker" means a person "selling, providing, or arranging for, transportation by motor carrier for compensation"), §13102(23) ("transportation" includes "a motor vehicle ... or equipment of any kind related to the movement of passengers or property" and "services related to that movement, including arranging for, receipt, delivery, ... and interchange of passengers and property"). Loyd, 416 F.Supp.3d at 1297 n. 9.

The phrase "related to" "embraces state laws having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly." However, "§14501(c)(1) does not preempt state laws affecting carrier prices, routes, and services 'in only a tenuous, remote, or peripheral ... manner.' " "[T]he breadth of the words 'related to' does not mean the sky is the limit." Furthermore, the "FAAAA formulation contains one conspicuous alteration [from the ADA] -- the addition of the words 'with respect to the transportation of property,'" and this phrase "massively limits the scope of preemption ordered by the FAAAA." (internal citations omitted).

*See also* Lupian, 905 F.3d at 133; Loyd, 416 F.Supp.3d at 1295.[8]

"[I]n Taj Mahal Travel, [the Third Circuit] framed the proper inquiry as: 'whether a common law tort remedy frustrates deregulation by interfering with competition through public-utility-style regulation.'" Lupian, 905 F.3d at 134 (citation omitted). "If a state law does not have such a regulatory effect, we determined, then the state law is 'too tenuous, remote or peripheral' to be preempted." *Id.* at 133 (citation omitted).

The Third Circuit in Lupian, *id.* at 135, then explained:

The purpose of the FAAAA's preemption clause is to prohibit states from effectively re-regulating the trucking industry and to promote "maximum reliance on competitive market forces." 49 U.S.C. §40101(a)(6). The preemption clause undoubtedly applies, for example, to state laws directly restricting types of goods that can be carried by trucks, tariffs, and barriers to entry. But state law may also be preempted if it has an indirect effect. This intent is patent in the

---

[8]"Due to parallel language in the statutes, courts follow caselaw interpreting the Airline Deregulation Act (ADA), 49 U.S.C. §1305(a)(1), to determine the scope of the FAAAA." Loyd, 416 F.Supp.3d at 1295 (citations omitted).

FAAAA insofar as the preemption clause employs the phrase "related to" immediately before "a price, route, or service of any motor carrier." *Id.* §14501(c)(1). The Supreme Court further observed that "state laws whose 'effect' is 'forbidden' under federal law are those with a '<u>significant</u> impact' on carrier rates, routes, or services." <u>Rowe</u>, 552 U.S. at 375, 128 S.Ct. 989 (quoting <u>Morales</u>, 504 U.S. at 388, 112 S.Ct. 2031).

Regardless if defendant is deemed a broker or a motor carrier under the FAAAA, this court must decide whether or not Pennsylvania's general tort law should be preempted by the FAAAA. The Third Circuit recently decided <u>Bedoya v. American Eagle Express, Inc.</u>, 914 F.3d 812 (3rd Cir. 2019), cert. denied, 140 S.Ct. 102 (2019). In <u>Bedoya</u>, the court analyzed whether or not a company's classification of employees as independent contractors under New Jersey Wage and Hour Law and New Jersey Wage Payment law were preempted by the FAAAA. "The <u>Bedoya</u> plaintiffs were truck drivers who brought a putative class action against their employer for classifying them as independent contractors when, in the plaintiffs' view, they were employees pursuant to the NJWHL and NJWPL." <u>Eagle Systems, Inc. v. Asaro-Angelo</u>, 2019 WL 3459088, *5 (D.N.J. July 31, 2019) (citing <u>Bedoya</u>, 914 F.3d at 815-16). The Third Circuit found that the drivers' claims were not preempted by the FAAAA. The Court stated that "[t]he FAAAA's focus on prices, routes, and services shows that the statute is concerned with the industry's production outputs, and seeks to protect them from state

- 17 -

regulation." <u>Bedoya</u>, 914 F.3d at 821. "The motor carrier industry's output –– the service it provides –– is the 'transportation of property from origin to destination.'" <u>Montoya</u>, 404 F.Supp.3d at 401 (citing <u>Bedoya</u>, 914 F.3d at 821). "Although state laws that regulate industry inputs –– labor, capital, and technology –– 'may impact costs and may in turn affect prices charged and services provided to customers,' the FAAAA does not preempt these kinds of regulations and laws." *Id.* (citing <u>Bedoya</u>, 914 F.3d at 821).

The court in <u>Montoya</u>, *id.* at 402, concluded that "[the] State law prohibiting alleged unfair and deceptive practices as to driver training programs for students who are seeking a CDL may have 'indirect effects' on [defendant's] trucking service, but the impact is 'tenuous, remote, or peripheral'", and thus held that plaintiff's consumer fraud claims were not preempted by the FAAAA.

In <u>Bedoya</u>, the Third Circuit split the analysis of a state law into two parts. First, courts should determine whether the challenged state law has a direct impact on prices, routes or services by looking to several factors:

> [T]o assess the directness of a law's effect on prices, routes, or services, courts should examine whether the law: (1) mentions a carrier's prices, routes, or services; (2) specifically targets carriers as opposed to all businesses; and (3) addresses the carrier-customer relationship rather than non-customer-carrier relationships (e.g., carrier-employee).

- 18 -

*Id.* at 821-23. (citations omitted).

The Third Circuit explained that when examining the third factor, courts should look to the challenged state law and determine if the regulation is geared towards "resource inputs" (labor, capital, and technology) or "product outputs" (services provided by the motor carrier industry). <u>Bedoya</u>, 914 F.3d 812. The FAAAA regulates product outputs but not resource inputs because "[a]lthough laws that regulate inputs may impact costs and may in turn affect prices charged and services provided to customers, 'no one thinks that the ADA or the FAAAA preempts these [regulations] and the many comparable state laws[.]'" *Id.* (citing <u>S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.</u>, 697 F.3d 544,558 (7th Cir. 2012).

The second part of the analysis in <u>Bedoya</u> is that courts should then determine whether the challenged law's indirect impact on prices, routes, or services is significant or not. If the law has a significant impact on the services a motor carrier provides, then the law should be preempted by the FAAAA. The Third Circuit explained in <u>Bedoya</u> that:

> To assess whether a law has a significant effect on a carrier's prices, routes, or services, courts should consider whether: (1) the law binds a carrier to provide or not provide a particular price, route, or service; (2) the carrier has various avenues to comply with the law; (3) the law creates a patchwork of regulation that erects barriers to entry, imposes tariffs, or restricts the goods a carrier is permitted to transport; and (4) the law existed in one of the jurisdictions Congress determined lacked

laws that regulate intrastate prices, routes, or services and thus, by implication, is a law Congress found not to interfere with the FAAAA's deregulatory goal.

*Id.* at 823.

Courts have found that personal injury claims based on a state's general negligence law are not preempted by the FAAAA or ADA. *See* Jimenez–Ruiz v. Spirit Airlines, Inc., 794 F.Supp.2d 344, (D.Puerto Rico 2011) (summarizing various Circuit Court decisions that found when plaintiff invoked traditional elements of tort law, courts have almost uniformly found no federal preemption); Owens v. Anthony, 2011 WL 6056409, at *3 (M.D. Tenn. Dec. 6, 2011).

Nonetheless, "Federal district courts are sharply divided on how to apply these guiding principles to personal injury claims alleging negligence by brokers in selecting motor carriers for the transportation of property." Loyd, 416 F.Supp.3d at 1295 (footnote omitted). The court in Loyd, 416 F.Supp.3d at 1295-96, then explained:

> There is no question that a common law negligence claim embodies a state law that may be preempted [by the ADA and FAAAA] under proper circumstances. *See* Northwest, Inc. v. Ginsberg, 572 U.S. 273, 281-82, 134 S.Ct. 1422, 188 L.Ed.2d 538 (2014) ("[S]tate common-law rules fall comfortably within the language of the ADA pre-emption provision" because it "applies to state 'law[s], regulation[s], or other provision[s] having the force and effect of law,'" and "[i]t is routine to call common-law rules 'provisions.'") (quoting 49 U.S.C. §41713(b)(1)). The difficulty is "draw[ing] a line between laws that are significantly

- 20 -

'related to' rates, routes, or services, even indirectly, and thus are preempted, and those that have 'only a tenuous, remote, or peripheral' connection to rates, routes, or services, and thus are not preempted." *See* Dilts v. Penske Logistics, LLC, 769 F.3d 637, 643 (9th Cir. 2014) (citing Rowe, 552 U.S. at 371, 128 S.Ct. 989).

Here, plaintiff asserts several claims against Quarterback: vicarious liability by Quarterback for the actions of Hataway, negligent and/or reckless hiring/supervision/retention of Hataway, negligent and/or reckless hiring/supervision/retention of Star, negligent entrustment of Hataway and Star, and joint venture of Quarterback and Ball Metal. Plaintiff's claims of vicarious liability, negligence and/or reckless hiring/supervision/retention of Hataway and Star, and negligent entrustment of Hataway and Star all delve into the employer-employee relationship. *See* Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 487-88 (3rd Cir. 2013) ("[Negligent hiring/supervision/retention] is specifically predicated upon two duties of an employer: the duty to reasonably monitor and control the activities of an employee, and the duty to abstain from hiring an employee and placing that employee in a situation where the employee will harm a third party."); Adames v. May Furniture, Inc., 2019 WL 8937042,*8-9 (M.D.Pa. Nov. 26, 2019)(stating that vicarious liability and negligent hiring/supervision/retention depend upon an employer-employee relationship).

- 21 -

A joint venture requires that: "1) each party must make a contribution of capital, materials, services or knowledge; 2) profits must be shared; and 3) there must be a joint proprietary interest in and right of mutual control over the subject matter of the enterprise." Beavers v. West Penn Power Co., 436 F.2d 869, 873 (3rd Cir. 1971). Once a party satisfies the test for a joint venture, the torts committed by one joint adventurer may be imputed upon other joint adventurers. *See* Beavers v. West Penn Power Co., 436 F.2d 869, 873 (3rd Cir. 1971); Friedman v. Wilson Freight Forwarding Co., 181 F.Supp. 327, 329 (W.D.Pa. 1960). Under Pennsylvania law, it is well-established that a person operating a motor vehicle has a duty to "exercise ordinary and reasonable care under the circumstances to avoid injury to others." Adley Express Co. v. Willard, 93 A.2d 676 (Pa. 1953). Plaintiff's claims of negligent hiring/supervising/retention and negligent entrustment rely upon a duty to exercise reasonable care in hiring, supervising, retaining, and entrusting Hataway and Star. Plaintiff's claim of vicarious liability and joint venture rely upon a duty that Hataway, acting as an agent of Quarterback, should have exercised ordinary and reasonable care under the circumstances to avoid injury to others. *See* Adley Express Co., 93 A.2d at 676. Plaintiff's claims boil down to imposing a duty of ordinary and reasonable care upon Quarterback. Thus, the question is then whether imposing Pennsylvania's common-law

duty of ordinary care directly targets or significantly impacts a motor carrier's prices, routes, or services.

Pennsylvania's common-law duty of ordinary care does not mention or target a motor carrier's prices, routes, or services. The duty is imposed on all businesses in the state. In Lupian, the Third Circuit dealt with package delivery drivers suing their employer for violations of the Illinois Wage Payment and Collection Act ("IWPCA"). 905 F.3d at 127. The employer claimed that IWPCA is preempted by the FAAAA because it would impact the employer's business model and prices it would charge its customers. *See id.* The Third Circuit stated that:

> Wage laws like the IWPCA are a prime example of an area of traditional state regulation, and we do not lightly conclude that such laws are superseded. Moreover, such laws are a part of the backdrop that motor carriers and all business owners must face in conducting their affairs. The IWPCA does not single out trucking firms, and it only concerns the relationship between employers and employees.

 Lupian, 905 F.3d at 136 (emphasis in original). The Court continued that although the IWPCA could have negative financial consequences for employers, that did not mean that the state law automatically became forbidden. *See Id.*; *See also* Costello v. BeavEx, Inc., 810 F.3d 1045 (7th Cir. 2016) (finding that the IWPCA's effects were sufficiently limited rather than having a significant impact upon the business's customers and the impact of

the IWPCA was too tenuous, remote, or peripheral to warrant preemption, even when employer provided evidence that hiring a human resource professional would cost an extra $185,000 per year). Like the IWPCA, Pennsylvania's common-law duty of ordinary care is part of the backdrop of laws that all businesses must follow. It in no way targets the trucking industry.

Additionally, plaintiff's negligence claims focus on Quarterback's relationship with those it employs. As the Third Circuit explained, state laws that target resource inputs, such as labor, capital, and technology, of a motor carrier are not preempted by the FAAAA. *See* Bedoya, 914 F.3d at 822. The Third Circuit stated, "[a]lthough laws that regulate inputs may impact costs and may in turn affect prices charged and services provided to customers, 'no one thinks that the ADA or the FAAAA preempts these [regulations] and the many comparable state laws[.]'" Bedoya, 914 F.3d at 822 (citing S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc., 697 F.3d at 558). Plaintiff's claims delve into the relationship between Quarterback and Hataway, and Quarterback's capital and technology. Even if plaintiff's claims may impact prices charged or services provided, the ADA or FAAAA were not intended to preempt state common-law claims that do not significantly impact prices, routes, or services. *But see* Loyd, 416 F.Supp.3d at 1297 (the court held that the cases that focus on the language of §14501(c)(1) and the factual

- 24 -

allegations of a plaintiff's negligence claim were "more persuasive." The court then stated that "[w]ith few exceptions, the conclusions reached by district courts conducting an express preemption analysis are that the 'services' of a freight broker involve arranging for a motor carrier to transport property and that a state-law negligent brokering claim is directly 'related to' the broker's performance of this service with respect to the transportation of property.") (string citations omitted); Krauss v. IRIS USA, Inc., 2018 WL 2063839, *5 (E.D.Pa. May 3, 2018) (court held that negligent hiring claims against freight broker "go to the core of what it means to be a careful broker" and thus, the claim was preempted by §14501(c)(1)).

The second part of the analysis in Bedoya requires the court to determine if the state law "has a significant impact on carrier rates, routes, or service." Bedoya, 914 F.3d at 818. Here, the law does not bind a carrier to provide or not provide a particular price, route, or service. The carrier has a variety of avenues to comply with Pennsylvania's tort law. Pennsylvania's law does not impose any barriers to entry, impose any tariffs, or restrict goods a carrier may transport. Pennsylvania's duty of care does not interfere with the FAAAA's deregulatory goal. In Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 194 (3rd Cir. 1998), the Third Circuit stated that "[f]reeing airlines from the pervasive control over prices, routes, and services

- 25 -

that existed previously does not require a grant of sweeping immunity from the tort liability that existed throughout the regulatory era." Even if one views that liability for tortious conduct has an indirect effect on price, routes, or services, the Third Circuit has found that state laws and regulations of this nature do not necessitate preemption. In <u>Bedoya</u>, the Third Circuit stated that even though the state law could have some negative financial consequences because the employer had to create a new department within the company, the impact was not significant enough to interfere with Congress' goal of deregulation. *See* <u>Bedoya</u>, 914 F.3d at 825.

Quarterback relies, in part, on <u>Krauss v. IRIS USA, Inc.</u>, 2018 WL 2063839, at *5 (E.D.Pa. May 3, 2018), in which, as indicated, the court "conclude[ed] that common law claims against a broker for negligent hiring (of the carrier) arising from dangerous loading of merchandise by carrier hired by broker were preempted by the FAAAA because the claim arose from the broker's core service, i.e., 'hiring motor carriers to transport shipments.'" <u>Marson v. Alliance Shippers, Inc</u>., 2020 WL 618581, *6 (E.D.Pa. Feb. 10, 2020). <u>Krauss</u> can be differentiated from the instant case because <u>Krauss</u> was decided before the Third Circuit's guidance in <u>Bedoya</u>. <u>Krauss</u> notes that while state common law claims of negligent hiring and retention do not expressly reference a freight broker or motor carrier's services, they have a

significant economic effect on a broker or motor carrier's services. *See* Krauss, 2018 WL 2063839, at *4 (citing Georgia Nut Co. v. C.H. Robinson Co., 2017 WL 4864857, at *3 (N.D.Ill. Oct. 26, 2017). Krauss does not explore the numerous factors Bedoya establishes to determine whether or not a state law has a significant impact on a broker or motor carrier's prices, routes, or services. The Krauss court states a significant economic impact, but does not explain how it reached that conclusion. *See* Krauss, 2018 WL 2063839, at *1-2, 5 ("[T]he negligent hiring claim...is that [plaintiff's] injuries directly flowed from [the broker's] failure to vet freight carrier KV Load. The claim therefore relates to the core service provided by [the broker] ... and will therefore have a significant economic impact on the broker's services ... therefore the Court concludes it is preempted.") (internal citations omitted).

In any event, this court is obliged to follow the Third Circuit's precedential Bedoya decision and not the Krauss case. The Third Circuit's reasoning in Bedoya that although a state law may have negative financial consequences for a broker or carrier does not mean that the state law should be preempted by the FAAAA is particularly relevant. *See* Bedoya, 914 F.3d at 822. The above analysis indicates that although Pennsylvania's tort law may have some negative financial consequences for a broker or carrier, it is not preempted by the FAAAA. Pennsylvania's tort law is a part of the

backdrop of laws that all businesses must follow. <u>Adames</u>, 2019 WL 8937042,*8-9.  It does not directly reference prices, routes, or services of a broker or motor carrier, and does not place a significant financial impact on a broker or motor carrier's prices, routes, or services.

Therefore, the court finds that plaintiff's tort claims are not preempted by the FAAAA, and that Quarterback is not entitled to summary judgment regarding plaintiff's claims against it. As such, Quarterback's motion for summary judgment, (Doc. 69), will be denied.

In plaintiff's motion for partial summary judgment, plaintiff argues that Hataway is either an employee of Quarterback as a common law agent, servant, or employee, or that pursuant to the FMCSR, Hataway is a statutory employee of Quarterback. The court finds that under either scenario alleged by plaintiff, genuine issues of material facts preclude summary judgment in his favor.

Plaintiff alleges that Quarterback is vicariously liable for Hataway's actions. Under Pennsylvania law, to establish vicarious liability, a plaintiff must show a master-servant relationship existed. *See* <u>Dickerson v. American Sugar Ref. Co., Inc.,</u> 211 F.2d 200, 202 (3rd Cir. 1954); <u>Adames v. May Furniture, Inc.,</u> 2019 WL 8937042,*6 (M.D.Pa. Nov. 26, 2019) ("[W]hen the relationship between the parties is that of 'master-servant' or 'employer-

employee,' as distinguished from 'independent contractor-contractee,' the master or employer is vicariously liable for the servant's or employee's negligent acts committed within the scope of his employment.") (citations omitted).

The Pennsylvania Supreme Court set forth an array of factors to be considered when examining the employer-employee relationship. *See* Hammermill Paper v. Rust Eng'g Co., 243 A.2d 389, 392 (Pa. 1968). These factors are: (1) control of the manner in which the work is done; (2) responsibility for the result only; (3) terms of agreement between the parties; (4) nature of the work/occupation; (5) skill required for performance; (6) whether one is engaged in a distinct occupation or business; (7) whether the work is part of the regular business of the alleged employer; (8) which party supplies the tools/equipment; and (9) whether the alleged employer has the right to terminate the employment at any time. *See* Adames, 2019 WL 8937042,*6-7 (citing Baum v. Workers' Comp. Appeal Bd.*,* 721 A.2d 402,405 (Pa. Cmwlth. 1998); Hammermill Paper v. Rust Eng'g Co.*,* 243 A.2d 389, 392 (Pa. 1968)). "Not all factors are required to establish an employment relationship." *Id.* at *7. "The most important of these factors which are entitled to the most weight are ' whether the purported employer has the right to hire and fire the employee; whether the employer has the right to direct the

manner of the employee's performance of the work; and whether the employer has the right to control the work to be completed.'" Adames, 2019 WL 8937042, *7 (citing Knect v. Balanescu, 2017 WL 4573796 at *4, (M.D.Pa. 2017)). "Ultimately, the question of whether an employment relationship exists is a 'question of law to be decided on the specific facts of each case' where the facts are not in dispute." *Id.* (citations omitted).

Here, plaintiff alleges that Quarterback exercised, or had the right to exercise, the requisite amount of control over Hataway to deem Quarterback his common law employer. Plaintiff's argument focuses on Appendix E to the Broker/Shipper Transportation Agreement, the Carrier Load Confirmation, and other sections of the Broker/Shipper Transportation Agreement. Plaintiff asserts that Appendix E establishes that Quarterback held itself out as a carrier, certified that it would provide "qualified personnel" and that it would "employ [] only fully qualified, competent, and legally licensed and permitted (without restriction) personnel." (Doc. 80, BMBC000014-17). Additionally, plaintiff asserts that the Carrier Load Confirmation provided the equipment to be used, specified the condition of the equipment, the time of delivery required for the load, and required that the driver identify himself as a representative of Quarterback at pick-up and delivery. Also, Plaintiff argues that Quarterback served as the only point of contact between Ball Metal and

Hataway. Quarterback provided all updates to the delivery process through the Carrier Load Report.[9]

Conversely, Quarterback argues that they did not have exclusive control because it was Star's sole responsibility to select the driver, it was Star's sole responsibility to provide the vehicle to be used, Quarterback had no say in who Star selected to drive the load, and Quarterback did not determine Hataway's route. In fact, Star owner Almir Muharemovic stated that Hataway used a personal GPS to determine his route.

Quarterback further argues that Appendix E to the Broker/Shipper Transportation Agreement is not a valid agreement anymore since it expired almost three years before the accident.

On the issue of whether Quarterback exercised, or had the right to exercise, the requisite amount of control over Hataway and whether Quarterback had the right to determine the manner in which the work was

---

[9]Since plaintiff cites to the applicable evidence upon which he relies in support of his summary judgment motion in his brief, (s*ee* Doc. 79 at 15-36, 38-39, 40-49, 55 (summary), 58), including the Shipper/Broker Transportation Agreement, the Carrier Load Confirmation document and report, the Bill of Lading, copies from Quarterback's website, Tender Acceptance email, copies of post-accident emails, the Load Reports, Moness's YouTube video, copy of advertisements, as well as the relevant deposition testimony of Quarterback's and Ball Metal's corporate designees and officials, this evidence is not repeated herein.

*(footnote continued on next page)*

preformed, this court finds that there is a genuine issue of material fact as to Hataway's status as a common law employee.[10]

In regards to the amount of control Quarterback exerted, plaintiff points to Quarterback requiring Hataway to identify himself as a Quarterback representative, Quarterback establishing the type of equipment to be used, the condition of said equipment, Quarterback determining the drop-off and pick-up times, and Quarterback being the central point of contact for Hataway and Ball Metal throughout the delivery process. To the contrary, Quarterback points to facts such as that it was Star's sole responsibility to select a driver, it was Star's sole responsibility to select the truck Hataway would drive, and Hataway determined the route he drove using a personal GPS. These facts show a genuine issue of material fact exists because some actions extend beyond those of a traditional broker and others show Quarterback's lack of control over the shipment.

On the seventh factor, whether the work is part of the regular business of Quarterback, plaintiff alleges that Hataway, serving as a driver, is very close to Quarterback's regular business, the transportation of goods in

_____

[10]Even considering the language in Quarterback's Chubb Policy, plaintiff submitted with his proposed reply brief, (s*ee* Doc. 94), the court still finds disputed issues of material fact exist as to whether Hataway was an employee or agent of Quarterback or whether he was employed by Star.

international commerce. Plaintiff's assertion relies on the conclusion that Quarterback is a carrier. For a driver to be part of Quarterback's regular businesses, it would require that Quarterback regularly employ drivers. If Quarterback is determined to be a broker, then Quarterback's regular businesses is hiring motor carriers who in turn hire drivers. While Plaintiff argues that drivers are part of Quarterback's regular business because drivers are needed to actually transport the shipment, this conclusion would mean that anyone needed to conduct the transport process would automatically be deemed an employee of any broker. Plaintiff's argument would essentially remove any distinction between brokers and motor carriers by making anyone involved in the shipment process an employee of the broker. Further, Quarterback has provided evidence that it neither hires nor employs any drivers. (Doc. 60, Exhibit C).

Additionally, plaintiff argues that if the court does not find that Hataway was a common law employee of Quarterback, then it should find that Hataway is a statutory employee of Quarterback. Plaintiff bases this claim upon the fact that Quarterback is a motor carrier under the FMCSR and as such, Hataway falls under the FMCSR definition of an employee of a motor carrier.

- 33 -

To determine whether or not Quarterback acted as a broker or a carrier, courts look to "how the party acted during the specific transaction at issue, which includes 'the understanding among the parties involved [and] consideration of how the entity held itself out.'" Louis M. Marson Jr., Inc. v. Alliance Shippers, Inc., ---F.Supp.3d---, 2020 WL 618581, at *3 (E.D.Pa. Feb. 10, 2020) (citing Richwell Grp., Inc. v. Seneca Logistics Grp., LLC, 2019 WL 3816890, at *3 (D.Mass. Aug. 14, 2019)). (additional citations omitted). "Thus, '[w]hether a company is a broker or a carrier is not determined by what the company labels itself, but by ... its relationship to the shipper.'" Id. (first alteration in original) (quoting Hewlett-Packard Co. v. Brother's Trucking Enters., Inc., 373 F. Supp. 2d 1349, 1352 (S.D.Fla. 2005)). Licenses that the defendant holds and its previous transactions are not dispositive to its role during the specific transaction in question. See Louis M. Marson Jr., Inc., 2020 WL 618581, at *3. The court looks to who arranged the details of the transport process. See id. The details of the transport process include factors such as: who handled the route, who packed the product, who coordinated the travel and release of the goods, whether or not the party acted as a go-between or served as a central point of communication for both the carrier and shipper, and if the shipper knew who was exactly carrying the load. See id. Courts have found that because

determining whether a defendant is a carrier or a broker is a fact specific inquiry, it may be inappropriate for summary judgement. *See* Louis M. Marson Jr., Inc., 2020 WL 618581, at *4; s*ee also* Essex Insurance Company v. Barrett Moving & Storage, Inc., 885 F.3d 1292 (11th Cir. 2018) ("This is necessarily a case-specific analysis, and as a result, summary judgment might not be appropriate in many cases.") (citing Nipponkoa Ins. Co., 2011 WL 671747, at *5)).

Here, Quarterback contends that because it possessed a license and insurance to only act as a broker, did not hire Hataway, and did not provide Hataway with the equipment needed to deliver the shipment, it cannot be deemed a motor carrier. While Quarterback is only licensed and insured as a broker, some of its actions extend beyond those of only a broker. Some of Quarterback's activities take on characteristics of a motor carrier: Quarterback directly communicated with the driver on the day of the pick up; Quarterback told the driver to report any problems to them directly, not Star; Quarterback told the driver to identify himself as a representative of Quarterback upon arriving at the shipper's facility; the driver signed the Bill of Lading as an agent or representative of Quarterback; the Bill of Lading listed Quarterback as the carrier; and Ball Metal only received communication from Quarterback regarding updates and tracking on the

shipment. (*See* Doc. 84-1, Exhibit C; Doc. 84-1, Exhibit D; *see also* evidence cited to in plaintiff's brief, (Doc. 79), as noted above). However, there are also several facts that support a contrary conclusion that Quarterback only acted as a broker, such as: Ball Metal and Star both indicated that they only knew Quarterback as a broker (Doc. 69); it was Star's sole responsibility to hire the driver; it was Star's sole responsibility to provide the truck for Hataway; and the route was determined by Hataway's personal GPS and not by Quarterback. (*See* Doc. 70, Exhibit A).

The court finds that the above stated disputed facts require a fact-intensive inquiry for a jury to determine whether Quarterback was a broker or carrier, which is inappropriate for summary judgment. *See* <u>Louis M. Marson Jr., Inc.</u>, 2020 WL 618581, at *5.

The rest of plaintiff's claim relates to Hataway being a statutory employee of Quarterback under the FMCSR. Plaintiff alleges that Quarterback's actions in the specific shipment on November 12, 2018 constituted those of a motor carrier. The argument continues that as a motor carrier, Quarterback would then be held to the FMCSR. Plaintiff then points to the definition of an employee within the FMCSR to allege that Hataway, even if stated to be an independent contractor, is still an employee of Quarterback. For the FMCSR definition of an employee to apply,

Quarterback must be deemed a motor carrier. Plaintiff's argument repeatedly hinges upon language in the FMCSR that clearly states the regulations apply to motor carriers. For this court to rule that Hataway is a statutory employee of Quarterback under the FMCSR, it would require the court to declare Quarterback a motor carrier in this specific shipment. As stated above, the issue of whether Quarterback acted as a motor carrier or broker in this specific shipment is not appropriate for summary judgement because many genuine issues of material facts exist.

Therefore, plaintiff's partial motion for summary judgment against Quarterback, (Doc. 75), will be denied.


## IV.   CONCLUSION

For the forgoing reasons, the court will **DENY** the cross-motions for summary judgment of Quarterback, **(Doc. 69)**, and plaintiff, **(Doc. 75)**. An appropriate order shall issue.

*s/ Malachy E. Mannion*

**MALACHY E. MANNION**
**United States District Judge**

**DATE: August 24, 2020**
19-753-06

- 37 -